

FILED

JAN 2 4 2005

L. CLERK
DISTRICT COURT, EDNC
BY_____ DEP. CLK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO. 5:05-CV-48-FL(1)

RICHARD P. NORDAN, as Ancillary          )
Administrator for the separate Estates of )
STEPHEN S. HELVENSTON, MIKE R.           )
TEAGUE, JERKO GERALD ZOVKO and           )
WESLEY J. K. BATALONA,                   )
                                         )
                                         )
                        Plaintiff,       )
                                         )
                                         )        NOTICE OF REMOVAL
        v.                               )
                                         )
BLACKWATER SECURITY                      )
CONSULTING, LLC, a Delaware Limited      )
Liability Company; BLACKWATER            )
LODGE AND TRAINING CENTER, INC.,         )
a Delaware Corporation, JUSTIN L.        )
McQUOWN, an individual; and THOMAS       )
POWELL, an individual,                   )
                                         )
                        Defendants.      )
_____)

        Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendants Blackwater Security Consulting,

LLC, Blackwater Lodge and Training Center, Inc., Justin L. McQuown, and Thomas Powell

("Defendants") file this Notice of Removal to remove civil action 05-CVS-000173 from the

Superior Court of North Carolina to the United States District Court for the Eastern District of

North Carolina.

        1.      On January 5, 2005, Plaintiff filed a Complaint in the Superior Court of Wake

County, North Carolina in the civil action *Richard P. Nordan, et al. v. Blackwater Security

Consulting, LLC, et al.*, case 05-CVS-000173.  A true and correct copy of all process, pleadings,

and orders of said civil action are attached hereto as Exhibit A.

Dockets.Justia.com

2.     The Complaint purports to present two claims: Wrongful Death and Fraudulent Misrepresentation in Contract. Plaintiff seeks to hold Defendants liable for the murders of Stephen S. Helvenston, Mike R. Teague, Jerko Gerald Zovko, and Wesley J.K. Batalona (hereinafter "Decedents") by Iraqi insurgents in Iraq, while the Decedents were providing security services in support of the United States Armed Forces in Iraq.

3.     Plaintiff's pleadings do not state that a federal question exists or inform the Court of certain facts. However, applicable law under the facts of this case mandates that this Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331. Removal is therefore proper. 28 U.S.C. §§ 1331 and 1441.

4.     The summons and complaint were served first upon Defendant Blackwater Lodge and Training Center, Inc. on January 11, 2005. Because this Notice of Removal is filed within thirty (30) days after service of the summons and complaint upon the first-served defendant, it is timely under 28 U.S.C. § 1446(b).

## FACTUAL BACKGROUND

5.     Kellogg Brown & Root, Inc. ("KBR") provides services to the United States Armed Forces and other U.S. agencies in Iraq and Kuwait pursuant to contract. ESS Support Services Worldwide, Eurest Support Services (Cyprus) International Ltd. ("ESS"), KBR's subcontractor, provides catering, design, and build support services to the United States Armed Forces and other United States contracting agencies in Iraq and Kuwait. ESS subcontracted some of these services to Regency Hotel & Hospital Company ("Regency").

6.     On March 12, 2004, Regency entered into an Agreement for Security Services, in support of its contract with ESS, with Blackwater ("Primary Agreement").

2

7.    Under the Primary Agreement, Blackwater supported the United States Armed Forces and other United States contracting agencies by providing "certain security services in support" of Regency's and ESS' contracts with the United States.

8.    Blackwater is a subcontractor to the United States Armed Forces.

9.    Among other relevant provisions, Article 6.1.2 of the Primary Agreement requires Blackwater "to maintain Defense Base Act ('DBA') insurance on all of its employees working in the provision of Security Services."

10.    Blackwater maintained DBA insurance on behalf of the Decedents, among others.

11.    Blackwater provided Security Services in support of the United States Armed Forces pursuant to the Primary Agreement.

12.    Decedents agreed to provide certain of those Security Service obligations in Iraq.

13.    The agreements governing the relationship between Blackwater and each Decedent were identical in all pertinent respects.

14.    Iraqi insurgents in Fallujah, Iraq murdered Decedents on March 31, 2004 while Decedents were providing Security Services in support of the Unites States Armed Forces, pursuant to the Primary Agreement.

15.    The Security Services provided by Decedents at the time they were murdered were identical in all pertinent respects.

16.    Decedent Helvenston's widow, Ms. Patricia Irby, filed a Claim for Death Benefits under the DBA with the Department of Labor ("DOL") on April 23, 2004.  Benefits in excess of $1,000 per week have been paid and continue to be paid.

17.    Decedent Batalona's widow, June Batalona, filed a Claim for Death Benefits with DOL prior to May 10, 2004. Benefits in excess of $1,000 per week have been and continue to be paid.

18.    Decedent Teague's widow, Rhonda Teague, has not yet filed a Claim for Death Benefits. Nonetheless, Death Benefits in excess of $1,000 per week have been paid and continue to be paid, in light of the statutory obligation to make such payments in the absence of a valid basis to controvert or deny DBA coverage.

19.    Decedent Zovko had no statutory beneficiaries. On October 18, 2004, the District Director, Office of Workers' Compensation Programs, Division of Longshore and Harbor Workers' Compensation, determined in its Compensation Order, Award of Compensation that Mr. Zovko "while performing service as an employee for the employer, sustained injuries resulting in his death and that such death comes within the purview of the above Act." Pursuant to the Longshore and Harbor Workers' Compensation Act ("LHWCA"), a statutory payment of $5,000 was made to the Special Fund.

20.    The other Decedents performed the same services under the same relationship with Blackwater as Decedent Zovko had. Consequently, a similar determination of coverage under the LHWCA and DBA in those cases is expected from the DOL, although the award of Compensation will differ because the other Decedents have statutory beneficiaries.

## COMPLETE PREEMPTION

21.    The DBA extends the LHWCA to provide an exclusive and comprehensive scheme of compensation for "the injury or death of any employee engaged" in certain listed forms of employment.[1] 42 U.S.C. §§ 1651(a) and 1651(c); 33 U.S.C. § 905(a).

---

[1] Except as modified within the DBA, the provision of the LHWCA, as amended, 33 U.S.C. § 901 *et seq.*, "shall apply." 42 U.S.C. § 1651(a)

22.     Section 1651(a)(4) specifically notes that DBA shall apply with respect to the injury or death of any employee who works "under a contract entered into with the United States or any executive department, independent establishment, or agency thereof (including any corporate instrumentality of the United States)" and for those who work under "any subcontract, or subordinate contract with respect to such contract."

23.     The Primary Agreement falls within the DBA because it is a subordinate contract with respect to a contract entered into with the United States to provide services outside the continental United States.  42 U.S.C. § 1651(a).

24.     Decedents all worked in support of Blackwater's obligation to provide Security Services, pursuant to the Primary Agreement.

25.     The DBA and LHWCA provide the exclusive means by which "an employer, contractor (or any subcontractor or subordinate subcontractor with respect to the contract of such contractor)" may be held liable for injuries or death arising out of employment covered under the DBA.  42 U.S.C. §§ 1651(a) and 1651(c); 33 U.S.C. § 905(a).

26.     This liability is exclusive, and in place of all other liability of such employer, contractor, subcontractor, or subordinate contractor.  *Id.*

27.     This exclusivity of remedy further extends to injuries or death alleged to be attributable to "the negligence or wrong of any other person or persons in the same employ."  33 U.S.C. 933(i).

28.     DOL already entered a Compensation Order with respect to Decedent Zovko.

29.     A compensation award under the DBA is exclusively committed to the jurisdiction of the DOL or a federal Administrative Law Judge.  33 U.S.C. § 919.

5

30.    Appeal of any such award is committed exclusively to the federal Benefits Review Board, 33 U.S.C. § 921(b), and reviewable only in a United States Court of Appeals. *Id.* § 921(c).

31.    Federal district courts have exclusive jurisdiction to hear proceedings to either: (a) compel enforcement of a Compensation Order, *id.* § 921(d); or (b) enjoin a compensation order made pursuant to the DBA.  42 U.S.C. § 1653(b) (such proceedings "*shall* be instituted in the United States district court").

32.    Congress established the DBA to "provide uniformity and certainty in availability of compensation for injured employees" in select employment contexts outside the United States. *Davila-Perez v. Lockheed Martin Corp.*, 202 F.3d 464, 468 (1st Cir. 2000).

33.    The question whether the LHWCA or DBA applies and provides an exclusive remedy is "exclusively a federal question which Congress never intended for state courts to resolve." *See In re CSX Transportation Inc.*, 151 F.3d 164, 167 (4th Cir. 1998).

34.    Plaintiff's claims seek to hold Defendants liable under state common law for deaths arising out of employment covered under the DBA and are completely preempted by the DBA.  *See Rosciszewski v. Arete Associates, Inc.*, 1 F.3d 225, 232–233 (4th Cir. 1993) (preemption transforms a state-law complaint into a complaint stating a federal claim for purposes of the well-pleaded complaint rule).

35.    Consequently, removal is proper pursuant to 28 U.S.C. §§ 1331, 1441, 1367, and 1446.

## PLAINTIFF'S CLAIMS IMPLICATE IMPORTANT FEDERAL INTERESTS

36.    Even aside from the preemptive effect of the DBA, Plaintiff's claims directly implicate unique federal interests in the utilization of and reliance on contractors and

subcontractors, residents of all states, who support the United States Armed Forces and other United States agencies in a foreign war zone.

37.    The efforts of the United States Armed Forces in Iraq depend on, and are supported by, an unprecedented level of work contracted to private companies by the Federal Government -- and its contractors' subcontractors.

38.    Furthermore, the interests of the United States flow directly from the sovereign to the subordinate contractors who carry out the government's interests in the critical and hazardous environment of a war zone.    An independent contractor performing its obligation under a government contract or subcontract implicates the same interests in getting the Government's work done as if done directly by the Government.

39.    If state law were applied to the claims in this case, uniquely federal interests would be frustrated.    Indeed, it would result in a direct and significant conflict with the objectives of federal policy and applicable federal legislation.

40.    DBA completely preempts state law.    Even if it did not, it reveals that Congress intended to avoid the possibility of state law inconsistencies in assessing claims for injury or death incurred in the course of work on behalf of the United States "performed outside the continental United States."    42 U.S.C. § 1651(a)(4); *see also* 42 U.S.C. § 1651(c); 33 U.S.C. § 905(a).

41.    Moreover, if, despite DBA coverage, contractors and subcontractors could nonetheless be required to defend themselves in state courts under state tort law, and potentially be held liable for state tort claims for harms covered by the DBA, the Federal Government will be directly and adversely affected.

42.    Blackwater, as well as other contractors supplying similar services in war zones, would be forced to either discontinue providing such services or prohibitively increase the cost of such contracts to the Government.

43.    Such interests are so important that the federal common law supplants state law, irrespective of Congress' intent to preempt the field, and provides an independent basis for federal jurisdiction.

44.    Consequently, removal is proper due to the aforementioned substantial and unique federal interests pursuant to 28 U.S.C. §§ 1331, 1441, 1367, and 1446.

## THE REMAINING REMOVAL PREREQUISITES HAVE BEEN SATISFIED

45.    As required by 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being filed with the Clerk of the Superior Court of Wake County, North Carolina and served upon Plaintiff's counsel.

46.    All properly joined and served Defendants join in this removal.[2]

47.    Defendants have not sought similar relief.

48.    The prerequisites for removal under 28 U.S.C. § 1441 have been met.

49.    The allegations of this Notice are true and correct and within the jurisdiction of the United States District Court for the Eastern District of North Carolina, and this case is removable to the United States District Court for the Eastern District of North Carolina.

50.    If any question arises as to the propriety of the removal of this action, the Defendants respectfully request the opportunity to present a brief and oral argument in support of their position that this case is proper for removal.

---

[2] See Exhibit B. Defendant Thomas Powell has not been served. By filing this notice of removal, no defendant waives service or submits to the personal jurisdiction of this Court.

WHEREFORE, the Defendants, desiring to remove this case to the United States District Court for the Eastern District of North Carolina, Western Division, being the district and division of said Court for the County in which said action is pending, pray that the filing of this Notice of Removal shall effect the removal of said suit to this Court.

This the 24th day of January, 2005.

WILEY REIN & FIELDING LLP

By: _____
Fred. F. Fielding
D.C. Bar No. 099296
Margaret A. Ryan
CO Bar No. 034687
1776 K Street NW
Washington, DC  20006
(202) 719-7000 (O)
(202) 719-7049 (F)

SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, LLP

By: _____
Kirk G. Warner
N.C. State Bar No. 16238
Mark A. Ash
N.C. State Bar No. 13967
P.O. Box 2611
Raleigh, North Carolina 27602
(919) 821-1220 (O)
(919) 821-6800 (F)

*Attorneys for Blackwater Security Consulting, LLC and Blackwater Lodge and Training Center, Inc.*

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this date served the foregoing in the above-entitled action upon all other parties to this cause by U.S. Mail, addressed to the following parties:

> David F. Kirby
> William B. Bystrynski
> Kirby & Holt, LLP
> Post Office Box 31665
> Raleigh, North Carolina  27622
>
> Daniel J. Callahan
> Brian J. McCormack
> Marc P. Miles
> Callahan & Blaine, APLC
> 3 Hutton Centre Drive, Suite 900
> Santa Ana, California  92707
> *Attorneys for Plaintiff*

This the 24th day of January, 2005.

Kirk G. Warner

WRFMAIN 12290498.1

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. _____

RICHARD P. NORDAN, as Ancillary )
Administrator for the separate Estates of )
STEPHEN S. HELVENSTON, MIKE R. )
TEAGUE, JERKO GERALD ZOVKO and )
WESLEY J.K. BATALONA, )
                                      )
           Plaintiffs, )
                                      )
     v. )
                                        )
BLACKWATER SECURITY )
CONSULTING, LLC, a Delaware Limited )
Liability Company; BLACKWATER )
LODGE AND TRAINING CENTER, INC., )
a Delaware Corporation, JUSTIN L. )
MCQUOWN, an individual; and THOMAS )
POWELL, an individual, )
                                      )
           Defendants. )
_____ )

**COMPLAINT**
**(Jury Trial Demanded)**

       Plaintiff RICHARD P. NORDAN, as the Ancillary Administrator of the Estate of

STEPHEN S. HELVENSTON, the Estate of MIKE R. TEAGUE, the Estate of JERKO

GERALD ZOVKO, and the Estate of WESLEY J.K. BATALONA, allege against Defendants,

BLACKWATER SECURITY CONSULTING, LLC, a Delaware Limited Liability Company;

BLACKWATER LODGE AND TRAINING CENTER, INC., a Delaware Corporation, JUSTIN

L. MCQUOWN, an individual; and THOMAS POWELL, an individual, and each of them, as

follows:

## PARTIES

1.      RICHARD P. NORDAN, a resident of Wake County, North Carolina, was duly appointed ancillary administrator of the estate of Stephen S. Helvenston, by the Superior Court of Wake County, North Carolina, on December 6, 2004.  He is acting as ancillary administrator in the institution of this wrongful death action, which is filed within two years of the death of Stephen S. Helvenston.

2.      RICHARD P. NORDAN, a resident of Wake County, North Carolina, was duly appointed ancillary administrator of the estate of Mike R. Teague, by the Superior Court of Wake County, North Carolina, on December 6, 2004.  He is acting as ancillary administrator in the institution of this wrongful death action, which is filed within two years of the death of Mike R. Teague.

3.      RICHARD P. NORDAN, a resident of Wake County, North Carolina, was duly appointed ancillary administrator of the estate of Jerko Gerald Zovko, by the Superior Court of Wake County, North Carolina, on December 6, 2004.  He is acting as ancillary administrator in the institution of this wrongful death action, which is filed within two years of the death of Jerko Gerald Zovko.

4.      RICHARD P. NORDAN, a resident of Wake County, North Carolina, was duly appointed ancillary administrator of the estate of Wesley J.K. Batalona, by the Superior Court of Wake County, North Carolina, on December 7, 2004.  He is acting as ancillary administrator in the institution of this wrongful death action, which is filed within two years of the death of Wesley J.K. Batalona.

5.      At all relevant times, Defendant BLACKWATER SECURITY CONSULTING,

2

LLC has been and is a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business in Moyock, North Carolina.

6.     At all relevant times, Defendant BLACKWATER LODGE AND TRAINING CENTER, INC. has been and is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Moyock, North Carolina.

7.     Defendants BLACKWATER SECURITY CONSULTING, LLC and BLACKWATER LODGE AND TRAINING CENTER, INC. are referred to herein collectively as "BLACKWATER."

8.     Plaintiff is informed and believes and thereon alleges that at all relevant times, Defendant JUSTIN MCQUOWN is an individual, currently residing in Virginia Beach, Virginia.

9.     Plaintiff is informed and believes and thereon alleges that at all relevant times, Defendant THOMAS POWELL is an individual, currently residing in Lynn Haven, Florida.

10.     Plaintiff is informed and believes, and thereon alleges that at all times relevant, each Defendant, was the agent, servant, representative and/or employee of each of the other Defendants, and that in doing the things hereinafter alleged, each Defendant was acting within the course and scope of his or her authority as such agent, servant, representative and/or employee, with the permission, knowledge, consent and ratification of each of the other Defendants.  Unless otherwise indicated, all Defendants are collectively referred to herein as the "Defendants."

11.     Plaintiff is informed and believes and thereon alleges that all contracts and agreements herein involved were to be performed in Iraq, and the surrounding regions and countries.

3

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

## OVERVIEW

12.     On March 31, 2004, Stephen Scotten ("Scott") Helvenston, Mike R. Teague, Jerko Gerald ("Jerry") Zovko, and Wesley J.K. Batalona were murdered by Iraqi insurgents while working as security contractors for BLACKWATER. These individuals were executed, burned, beaten, and two of them were strung up on a bridge over the Euphrates River. The fact that these four Americans found themselves located in the high-risk, war-torn City of Fallujah without armored vehicles, automatic weapons, and fewer than the minimum number of team members was no accident. Instead, this team was sent out without the required equipment and personnel by those in charge at BLACKWATER.

13.     When these four individuals signed on with BLACKWATER to be security contractors in Iraq, they did so with the understanding that BLACKWATER would provide them with certain protections, tools and information to allow them to perform their job.

a.     They were told that each security mission would be handled by a team of no less than six (6) members.

b.     They were told that each security mission would be performed in armored vehicles.

c.     They were told that these security teams would be comprised of at least two armored vehicles, with at least three security contractors in each vehicle, which would provide for a driver, a navigator, and a rear-gunner.

d.     They were told that the rear-gunner would have a heavy automatic weapon, such as a "SAW Mach 46," which could fire up to 850 rounds per minute, allowing the

4

gunner to fight off any attacks from the rear.

      e.     They were told that they would be given at least 24-hours notice prior to any security mission.

      f.     They were told that each security detail mission would be subject to a Risk Assessment completed prior to the mission, and that if the threat level was too high, they would have the option of not performing the mission.

      g.     They were told that they would be afforded the opportunity to review the travel routes, gather intelligence about each mission, do a pre-trip inspection of the route and determine the proper logistics to carry out the security detail.

      h.     They were told that they would arrive in the Middle East and have at least 21 days prior to any operations to become acclimated to the area, learn the lay of the land, gather intelligence, and learn safe routes through the area.

     14.     All of these representations are what these individuals relied upon in deciding to become security contractors for BLACKWATER. Unfortunately, BLACKWATER's representations were untrue and BLACKWATER cut corners in the interest of higher profits, which ultimately resulted in the deaths of these four Americans.

     15.     On March 30, 2004, Helvenston, Teague, Zovko and Batalona were sent out on a security mission by BLACKWATER. However, BLACKWATER intentionally and knowingly failed to provide them with the protections, tools and information that it initially represented.

      a.     BLACKWATER did not provide them with the minimum number of six (6) members on the security detail team.

      b.     BLACKWATER did not provide them with armored vehicles.

c.     BLACKWATER did not permit them to have three team members in each vehicle, which resulted in each vehicle containing only a driver and a navigator, but no rear-gunner to quell any attacks.

d.     BLACKWATER did not provide them with heavy automatic machine guns, but instead merely with semi-automatic rifles (which had not even been tested or sighted).

e.     BLACKWATER did not provide them with 24-hours notice of the security mission.

f.     BLACKWATER did not conduct a Risk Assessment prior to the March 30, 2004 security mission, and the Plaintiff is informed and believes and thereon alleges that it actually created one after these four Americans were killed.

g.     BLACKWATER did not provide them with the opportunity to gather intelligence concerning the travel route, do a pre-route inspection, and even refused to give them maps of the area.

h.     BLACKWATER did not send them to the Middle East 21 days prior to any operations to become acclimated to the area, learn the lay of the land, gather intelligence, and learn safe routes through Iraq, but instead they were sent over only a few days before they became operational.

16.     As such, BLACKWATER intentionally and knowingly sent Helvenston, Teague, Zovko and Batalona into known harm's way without the needed and promised protections.

17.     On March 31, 2004, Helvenston, Teague, Zovko and Batalona were attempting to carry out a security mission for BLACKWATER. Without having any information about the route or even a map of the area, they became lost and ended up driving through the center of the

6

City of Fallujah. While stopped in traffic, several armed Iraqi insurgents walked up behind these two unarmored vehicles and repeatedly shot these four Americans at point blank range, dragged them from their vehicles, beat, burned and disfigured them and desecrated their remains. Had they been provided with the protections, tools and information that they were promised when they signed up for their job at BLACKWATER, Helvenston, Teague, Zovko and Batalona would be alive today.

## THE CONTRACTS

18.    ESS Support Services Worldwide, Eurest Support Services (Cyprus) International, Ltd. ("ESS") is a business with two divisions: one which provides catering support services and the other which provides design and building services to U.S. Armed Forces and other U.S. contracting agencies in Iraq and Kuwait.

19.    Regency Hotel and Hospital Company ("REGENCY") is a Kuwaiti company that entered into an agreement with ESS to support its services in the Middle East. REGENCY is headquartered in Kuwait City and is run by an American businessman, Tim Tapp, and a Kuwaiti National, Jameel A.R. Al Sane.

20.    Initially, the security detail for the ESS operations was provided by a company called Control Risk Group ("CRG").

21.    One of the owners of REGENCY, Jameel A.R. Al Sane, developed a business relationship with a BLACKWATER employee, John Potter. Based upon this relationship, Mr. Al Sane proposed that BLACKWATER and REGENCY join forces and submit a bid to ESS to replace CRG as the provider of security services for the food convoys. Ultimately, REGENCY

and BLACKWATER prevailed on their bid to ESS, and were awarded the security contract for ESS's catering operations in the Middle East.

22.    Initially, REGENCY and BLACKWATER partnered together and entered into a contract with ESS to provide security services for ESS's operations. On March 8, 2004, this contract (the "PRIMARY CONTRACT") was entered into by ESS, on the one hand, and REGENCY and BLACKWATER, on the other.

23.    Plaintiff is informed and believes and thereon alleges that BLACKWATER immediately became concerned about its partnership with REGENCY in the PRIMARY CONTRACT, because it wanted complete control over the security detail, without input from REGENCY. Pressure was applied by BLACKWATER's headquarters to resolve the problems so that the PRIMARY CONTRACT could be implemented quickly. To remedy this issue, the PRIMARY CONTRACT was duplicated into another almost identical sub-contract between REGENCY and BLACKWATER (the "SUB-CONTRACT"), which was entered into on March 12, 2004.

24.    Due to the hostile environment of the Iraqi theater, the PRIMARY CONTRACT mandated that each security detail consist of a minimum team size of six (6) operators, with a minimum of two vehicles, to support ESS movements at all times. In addition, the PRIMARY CONTRACT required that all of those vehicles were to be armored vehicles.

25.    However, when the SUB-CONTRACT between REGENCY and BLACKWATER was drafted, the armored vehicle provision was surreptitiously omitted. Plaintiff is informed and believes and thereon alleges that this was done so as to allow BLACKWATER to save $1.5 million on the cost of armored vehicles. Prior to the

8

implementation of this SUB-CONTRACT, John Potter brought to the attention of
BLACKWATER's managing agents, including Mike Rush, who is the Director of
BLACKWATER, the fact that the SUB-CONTRACT did not contain the requirement for
armored vehicles.

26.    Plaintiff is informed and believes and thereon alleges that since Mike Rush had
already informed BLACKWATER's president, Gary Jackson, that the contract problems had
been resolved, he refused to redraft and renegotiate the SUB-CONTRACT, all the while knowing
that this failure would seriously jeopardize the health and safety of BLACKWATER's security
contractors in Iraq.

27.    Due to the absolute necessity of armored vehicles in the hostile Iraq theater,
BLACKWATER's initial Program Manager for the ESS project, John Potter, insisted that the
SUB-CONTRACT include armored vehicles, not only to comply with the PRIMARY
CONTRACT, but more importantly to protect the security contractors who would be working in
the area.  However, obtaining armored vehicles would not only be an expense to
BLACKWATER, but would also cause a delay in commencing operations.  Thus, on March 24,
2004, BLACKWATER fired Potter as Program Manager and replaced him with another
BLACKWATER employee, JUSTIN MCQUOWN.

28.    Plaintiff is informed and believes and thereon alleges that MCQUOWN seriously
lacked the education, training and experience to be the Program Manager of the ESS project.
Nonetheless, MCQUOWN hurried preparations along to achieve an early implementation of the
contract.  MCQUOWN failed to provide adequate training and intelligence data to the security
contractors hired by BLACKWATER for the ESS project.  MCQUOWN even denied the

9

contractors the opportunity to properly test and sight their weapons before becoming operational or to review the travel routes with the security contractors from CRG before taking over the ESS project.

29.     At no time did BLACKWATER advise ESS that the support vehicles would not be armored; nor did BLACKWATER advise the security contractors of the falsity of its representations and promises, especially concerning the armored vehicles.

30.     Prior to entering into their individual Independent Contractor Service Agreements with BLACKWATER, Helvenston, Teague, Zovko and Batalona were all advised of the requirements of the PRIMARY CONTRACT, which mandated that the security detail teams would be comprised of no less than six (6) members and that each team would be operating with no less than two armored vehicles. They were never told that BLACKWATER deleted the requirement of armored vehicles from the SUB-CONTRACT. This fact was intentionally concealed from them by BLACKWATER.

31.     On or about March 25, 2004, Helvenston, Teague, Zovko and Batalona entered into their individual Independent Contractor Service Agreements in reliance upon the representations that BLACKWATER was affording them certain protections, tools and information as set forth in the PRIMARY CONTRACT. Helvenston, Teague, Zovko and Batalona, and each of them, were hired by BLACKWATER as independent contractors, and were at no relevant time employees of BLACKWATER. By the express terms of the Independent Contractor Service Agreements, they incorporate the terms of the SUB-CONTRACT, which in turn incorporates the terms of the PRIMARY CONTRACT. BLACKWATER, choosing the path of maximizing its profits over the protection of its security

10

contractors, did not provide the contractors with the promised protections, tools and information.

32.    Plaintiff is informed and believes and thereon alleges that at the time the PRIMARY CONTRACT was being negotiated, BLACKWATER was negotiating a similar contract with ESS's construction division to also provide security services for ESS's construction projects. The ill-fated March 31, 2004 mission was an attempt by BLACKWATER to prove to ESS that it could deliver the security detail ahead of schedule, even though the necessary vehicles, equipment and support logistics were not in place. These pending negotiations regarding the construction security contract with ESS, and the money that would flow to BLACKWATER as a result thereof, was one of the motivations for placing Helvenston, Teague, Zovko and Batalona in harm's way without the required protections, tools and information.

## THE PREPARATIONS

33.    When CRG learned that BLACKWATER would replace it on the ESS security detail, CRG served notice that it would phase out all of its personnel by March 29, 2004. However, pursuant to the PRIMARY CONTRACT and the SUB-CONTRACT, BLACKWATER was not scheduled to be operational until April 2, 2004, at the earliest. The first phase of CRG's multi-phase withdrawal from the ESS security detail occurred on March 19, 2004. The BLACKWATER personnel designated to replace the CRG employees did not arrive in Iraq until March 18, 2004, leaving grossly inadequate time to train them and acclimate them to the country.

34.    Plaintiff is informed and believes and thereon alleges that BLACKWATER and JUSTIN MCQUOWN continued to hastily make preparations to become operational as the

11

security detail in advance of the April 2, 2004 start date, while at the same time refusing to allow the security contractors that had arrived in Kuwait to learn the routes from CRG. In doing so, they jeopardized the training, intelligence and protections needed for Helvenston, Teague, Zovko and Batalona to perform their jobs.

35.    When Mr. Potter helped negotiate the original contracts, they called for a 30-day implementation after the signing of the contracts. The PRIMARY CONTRACT was entered into on March 8, 2004. The SUB-CONTRACT was not entered into until March 12, 2004. Under the *original* terms of these agreements, BLACKWATER would not have been operational until the middle of April 2004. However, the contracts were modified to provide for operational status within 21 days, resulting in the April 2, 2004 start date.

36.    Plaintiff is informed and believes and thereon alleges that BLACKWATER's Mike Rush was supposed to send all 30 BLACKWATER contractors to the Middle East immediately, so that there could be a smooth transition with the CRG team, and so they could perform all the necessary training prior to becoming operational. However, Mike Rush did not immediately send the BLACKWATER contractors, thereby jeopardizing their training and preparation. This delay in sending the BLACKWATER contractors to the Middle East was done purposely to save expenses and increase profits. Under the contracts, BLACKWATER was being paid up front, regardless of the amount of people that it had in Iraq. Therefore, every day that BLACKWATER held the contractors back in the United States, it would not have to pay the contractors their high-risk detail salaries, but would still reap the benefit of obtaining money for those contractors pursuant to the contracts with ESS and REGENCY.

37.    Plaintiff is informed and believes and thereon alleges that even after the security contractors arrived in the Middle East, they were denied the ability to gather intelligence, become acclimated to the territory, travel the routes and learn local customs. As CRG was phasing out its security details for ESS, it continually contacted BLACKWATER to arrange for the new security contractors to accompany CRG on their security missions. This was designed to allow the BLACKWATER security contractors to become familiar with the area, learn the safe routes, interact with the ESS personnel and acquire the logistical information and intelligence to protect them on future security details. JUSTIN MCQUOWN intentionally refused to allow the BLACKWATER security contractors to conduct these ride-alongs with the CRG teams.

38.    Per the contracts, Helvenston, Teague, Zovko and Batalona were supposed to be supplied with "SAW Mach 46" weapons, which are heavy automatic machine guns that had the capacity of firing up to 850 rounds per minute. Instead, they were provided with Mach 4 semi-automatic weapons, because BLACKWATER's managing agents, Mike Rush and Brian Berrey, refused to purchase the more expensive heavy automatic weapons. In fact, the Mach 4 weapons did not even arrive in Kuwait until March 18, 2004, where they still needed to be assembled.

39.    The contractors never had an opportunity to test, fire or sight their weapons before their security details. MCQUOWN told them that there was no time for them to be able to shoot their weapons to determine their accuracy and make necessary adjustments. This basic act of security preparation was not permitted, despite a BLACKWATER policy in place in Kuwait which provided for vehicle driving, training and weapons sighting to be performed prior to the commencement of any security detail.

## ANIMOSITY TOWARD THE CONTRACTORS

40.    Plaintiff is informed and believes and thereon alleges that JUSTIN MCQUOWN harbored extreme animosity toward Scott Helvenston relating to Helvenston's superior credentials, abilities, training, education, experience and knowledge.  This animosity dated back to the training program at BLACKWATER's facility in North Carolina, prior to their deployment under the ESS project.  MCQUOWN was a BLACKWATER instructor of classes that Helvenston attended.  However, MCQUOWN seriously lacked the education, training and experience to be a competent instructor.  On the other hand, Helvenston had been a Navy SEAL for many years and had acquired a vast amount of expertise.

41.    Plaintiff is informed and believes and thereon alleges that during training, MCQUOWN would often improperly instruct the class or provide erroneous information, tactics or techniques.  On occasion, Helvenston would attempt to politely assist MCQUOWN by offering his expertise on the correct manner of the particular training exercise.  The fact that MCQUOWN's lack of education and experience was being exposed infuriated him and ignited his hatred toward Helvenston.  Ultimately, MCQUOWN caused derogatory comments to be placed in Helvenston's BLACKWATER personnel file.

42.    Originally, John Potter was the Program Manager for the ESS project; however, once he complained that the BLACKWATER contractors were insufficiently protected because they were not receiving the promised armored vehicles and heavy weapons (as required by the PRIMARY CONTRACT), he was removed from his position as Program Manager.  JUSTIN MCQUOWN was then promoted and replaced John Potter as the Program Manager for the ESS project.

14

## THE CHANGE IN MISSION

43.     When Helvenston originally arrived in Kuwait on or about March 18, 2004, he was placed on a six (6) man security detail team.  On or about March 27, 2004, Helvenston and his team were advised that they would be leaving in two days for Baghdad to start their first mission.  However, on March 28, 2004, at approximately 10:00 p.m. that evening, while Helvenston and other teammates were at dinner in a local restaurant, MCQUOWN called Helvenston and informed him that he needed to pack up immediately and that he would be leaving at 5:00 a.m. the next morning on a security mission to Baghdad with a different team, with which he had no prior experience or training.

44.     At that time, Helvenston was feeling physically ill and informed MCQUOWN that he was not in a condition to be able to leave early the following morning.  Helvenston discussed the situation with his teammates at dinner, and another Blackwater contractor, Chris Wyse, who had been operating in the Middle East for some time, offered to take Helvenston's place on the mission the next morning.

45.     Helvenston and his teammates then returned to their rooms as Helvenston was feeling physically ill.  Shortly thereafter, JUSTIN MCQUOWN and Jim Graham burst into Helvenston's bedroom and aggressively approached Helvenston while he was lying in his bed.  While it appeared that MCQUOWN was going to physically attack Helvenston, he did not, but instead screamed at and berated him—calling Helvenston a "coward" and other demeaning and derogatory names.  MCQUOWN then threatened to fire Helvenston if he did not leave early the next morning with the new team.

15

46.    Helvenston reiterated that he was physically ill and was simply not able to leave on his first mission into Iraq in his present condition. At that time, yet another Blackwater contractor offered to replace Helvenston in the following day's mission. However, due to MCQUOWN's animosity toward Helvenston, he refused to replace him with any other contractor, despite these two willing offers.

47.    Eventually, Helvenston was forced to defend himself as MCQUOWN became more hostile and combatant toward him, which culminated in Helvenston chasing MCQUOWN and Graham out of his bedroom. As MCQUOWN was leaving, he told Helvenston that he was fired.

48.    Shortly thereafter, MCQUOWN returned to Helvenston's bedroom and confiscated his weapons. At that time, MCQUOWN also told Helvenston that he would still be leaving at 5:00 a.m. the following morning with a new team to go to Baghdad. Helvenston had never met any of these team members, did not know where he was going, was physically ill and tired, and did not have his bags prepared to be leaving early the following morning. It was virtually unheard of to take a single person, like Scott Helvenston, and place him on a different group with whom he had never trained or even met.

49.    That night, Helvenston drafted an e-mail to the "Owner, President and Upper-Management" of BLACKWATER. In this e-mail, he exposed JUSTIN MCQUOWN's erratic behavior and plot against him, and requested their intervention—which unfortunately never came. This was one of Scott Helvenston's very last communications.

## THE INCIDENT

50.      Once Helvenston and his new team arrived in Baghdad, they were under the direction of Blackwater employee, TOM POWELL (the Site Manager in Baghdad), who answered directly to JUSTIN MCQUOWN (the Program Manager of the entire ESS project).

51.      Plaintiff is informed and believes and thereon alleges that at that time, TOM POWELL had six (6) Blackwater contractors in Baghdad to perform the security detail which was required by ESS. However, at the direction of JUSTIN MCQUOWN, TOM POWELL sent only four contractors on the security detail, in direct violation of all of BLACKWATER's policies and agreements. Those four security contractors were Scott Helvenston, Mike Teague, Jerry Zovko and Wesley Batalona. The other two contractors were kept behind at the team house to perform menial, clerical work.

52.      Sending out a security team of only four individuals was contrary to the provisions of all of the contracts, which required a minimum of six (6) team members on each and every security detail, and was contrary to the promises made to these men upon their hire with BLACKWATER. Moreover, the U.S. State Department also has policies for personnel security details and require a six-man detail working in the threat level of Iraq. The ESS contracts specifically provided that the training and standard operating procedures would be consistent with the State Department. However, all of these requirements for six-man teams were completely disregarded by MCQUOWN and POWELL.

53.      The two vehicles that this four-man team drove were not armored vehicles. This was contrary to the express terms of the PRIMARY CONTRACT, which were incorporated into the SUB-CONTRACT and the Independent Contractor Service Agreements, and was contrary to

17

what was told to the security contractors in inducing them to execute their Independent Contractor Service Agreements.

54.     Sending four men on the security mission, instead of the required six, essentially took away the team's ability to defend itself. Not having one driver, one navigator and a rear-gunner with a 180 degree field of fire, the team never had a chance. By placing only two individuals in the car without the rear-gunner, the insurgents were able to literally walk up behind the vehicles and open fire upon them at close range. Also, since the four-man team was not traveling in armored vehicles, they had no protection against the small arms fire that they encountered.

55.     In Baghdad, Helvenston, in the very short amount of time that he had before being sent out on this mission, attempted to obtain maps of the area where they were supposed to be traveling. Plaintiff is informed and believes and thereon alleges that a BLACKWATER employee, Mark Furrad, refused to give him maps of the area, and instead callously told him that it was too late for maps and to just do his job with what he had. The team had no knowledge of where they were going, no maps to review, and had nothing to guide them to their destination.

56.     Plaintiff is informed and believes and thereon alleges that JUSTIN MCQUOWN and TOM POWELL knew that sending Scott Helvenston and the three other team members out on a mission into Fallujah in this condition—without a six-member team, without armored vehicles, and without directions or maps—could result in death to the entire team.

57.     On March 30, 2004, JUSTIN MCQUOWN and TOM POWELL sent this team out, without the required six-members, without armored vehicles and without even a map for directions, to escort three ESS flatbed trucks from the City of Taji to a U.S. Army base in Iraq,

18

commonly referred to as Camp Ridgeway.  Because this team was not given the time to properly prepare, was not able to plot out the route and destination and was denied the opportunity to even see maps of the area, they became lost during their transport of these ESS trucks.

58.     As night was falling in Iraq on March 30, 2004, the four-man security team and its convoy were still lost.  They were able to find a nearby U.S. Marine base, commonly referred to as Camp Fallujah.  They decided to stay the night at this Marine base and attempt to find their way in the morning.

59.     On March 31, 2004, the team made another attempt to transport the ESS trucks to Camp Ridgeway.  Camp Ridgeway was located approximately forty-five minutes away from Camp Fallujah, provided a route was taken directly through the center of the City of Fallujah.  At that time, Fallujah was universally known to be extremely hostile territory in control of Iraqi insurgents.  In fact, as on March 31, 2004, the U.S. military and coalition forces had not yet attempted to enter the center of Fallujah.

60.     However, because this four-man BLACKWATER team had not been able to perform a pre-trip analysis of their route and was denied maps and logistical information concerning the area, they set out toward Camp Ridgeway on a road which led directly through the heart of the hostile Fallujah.  Unbeknownst to them, there was an alternative, safer route which led around the outskirts of Fallujah and would have only taken them approximately two and a half hours longer to get to Camp Ridgeway.

61.     As this four-man BLACKWATER team escorted the three ESS flatbed trucks through the center of Fallujah, they were ambushed by hostile Iraqi insurgents.  Since the team was driving without a rear-gunner and did not have armored vehicles, the insurgents were able to

literally walk up behind the vehicles and shoot all four men with small arms at close range. Their bodies were pulled into the streets, burned and their charred remains were beaten and dismembered. Ultimately, two of the burnt bodies were strung up from a bridge over the Euphrates River for all of the world to see.

62.    After the March 31, 2004 ambush occurred, TOM POWELL conducted an investigation and prepared an After Action Report. This After Action Report has never been revealed outside of BLACKWATER. In fact, shortly after preparing this After Action Report, which began to reveal JUSTIN MCQUOWN's actions toward Scott Helvenston and the other team members, TOM POWELL was dismissed from his employment with BLACKWATER.

63.    Plaintiff is informed and believes and thereon alleges that BLACKWATER has attempted to cover-up this deadly ambush to hide the fact Helvenston, Teague, Zovko and Batalona were all killed two days prior to the already-expedited April 2, 2004 start date for the BLACKWATER contractors to first become operational in Iraq. At the time they were killed, the BLACKWATER contractors were merely supposed to be training, gathering intelligence and riding along with the CRG teams.

64.    Plaintiff is informed and believes and thereon alleges that as a further attempt to cover-up this incident, BLACKWATER fabricated critical documents. A Risk Assessment of each security detail was supposed to be done prior to the security missions, and was to be signed off by the security detail leader. Based upon the Risk Assessment, BLACKWATER was to have determined whether to perform the mission as requested by ESS. With respect to the March 31, 2004 incident, no Risk Assessment was ever done prior to the dispatch of the mission. Plaintiff is informed and believes and thereon alleges that BLACKWATER instead created one after this

20

deadly ambush occurred.

65.    Ultimately, BLACKWATER, JUSTIN MCQUOWN and TOM POWELL were responsible for sending this four-man team out without the sufficient amount of team members, without armored vehicles, without the proper weapons, and without any logistics or maps concerning the routes to be taken.  Nonetheless, after the March 31, 2004 ambush, wherein these four contractors were murdered, POWELL attempted to credit himself with saving two lives, by proudly claiming that if he had sent a six-man team, there would have been six deaths.

66.    Plaintiff is informed and believes and thereon alleges that BLACKWATER continued the pattern and practice of insufficiently training its contractors, and sending them into high-risk areas without the proper weapons, armored vehicles and logistics.  In addition to the four BLACKWATER security contractors killed on March 31, 2004, five other BLACKWATER security contractors assigned to the ESS project were also killed in Iraq.

67.    More specifically, on June 2, 2004, a BLACKWATER security contractor was killed in Iraq.  On June 5, 2004, four more BLACKWATER security contractors were killed in Iraq.  As such, in just a few weeks, BLACKWATER lost 9 of its 30 security contractors, which constitutes an incredibly high 30% death rate, which could have been avoided with proper training and equipment.

## FIRST CAUSE OF ACTION

### [Damages for Wrongful Death Against All Defendants]

68.    Plaintiffs repeat and replead Paragraphs 1 through 67, inclusive, and incorporate the same herein by reference.

69.    BLACKWATER, JUSTIN MCQUOWN, and TOM POWELL intentionally, deliberately and with reckless disregard for their health and safety, sent Helvenston, Teague, Zovko and Batalona, and each of them, into the very high-risk area of Fallujah without the required six (6) man team, without a minimum of two (2) armored vehicles, without a rear-runner, without heavy automatic machine guns, without 24 hours notice prior to the security mission, without having conducted a Risk Assessment to determine the threat level of the mission, without the opportunity to review the travel routes, gather intelligence regarding the mission, perform a pre-trip inspection of the route, determine the proper logistics or even review a map of the area, and without permitting them to test and sight the weapons they were actually given.

70.    When the Defendants sent Helvenston, Teague, Zovko and Batalona out on this security mission in this condition, without the proper protections, tools and information, they knew that they were sending them into the center of Fallujah with very little chance that they would come out alive.

71.    As a proximate result of the Defendants' intentional conduct, willful and wanton conduct, and/or negligence, as alleged herein above, Helvenston, Teague, Zovko and Batalona, and each of them, were killed March 31, 2004.

72.    Prior to his death, Scott Helvenston was a provider of love, support, comfort, guidance, advice and companionship to his two minor children, Kyle J. Helvenston and Kelsey E. Helvenston, as well as financial support to their mother and his.

73.    Prior to his death, Mike Teague lived with his wife Rhonda Teague and his minor son Brandon Teague to whom he was a provider of love, support, comfort, guidance, advice and

companionship, as well as being a faithful and dutiful husband.

74.     Prior to his death, Jerry Zovko was a provider of love, support, comfort, guidance, advice and companionship to his mother and father, Danica Zovko and Jozo Zovko, respectively.

75.     Prior to his death, Wesley Batalona lived with his wife June Batalona to whom he was a faithful and dutiful husband, as well as a provider of love, support, comfort, guidance, advice and companionship to her and his daughter Kristal Batalona.

76.     As a proximate result of the aforementioned wrongful conduct of the Defendants, and the deaths of Helvenston, Teague, Zovko and Batalona, those persons described herein, and each of them, sustained the loss of society, companionship, comfort, guidance, kindly offerings, advice, services, protection, care and assistance, as well as the net incomes of the decedents, and each of them.

77.     The wrongful acts committed by BLACKWATER, as herein alleged, were condoned, approved and ratified by its officers and directors, such as Brian Berrey and Mike Rush, and were participated in by its managing agents, such as JUSTIN MCQUOWN and THOMAS POWELL, and were the result of the Defendants' fraud, malice and willful and wanton conduct, in the conscious disregard for the health and safety of others, so as to justify an award of punitive damages.

78.     At all relevant times alleged herein, JUSTIN MCQUOWN and THOMAS POWELL were managers of BLACKWATER SECURITY CONSULTING, LLC and/or BLACKWATER LODGE AND TRAINING CENTER, INC., and as such BLACKWATER is liable for their acts of fraud, malice and willful and wanton conduct.

79.     At all relevant times alleged herein, Brian Berrey and Mike Rush were officers and/or directors of BLACKWATER SECURITY CONSULTING, LLC and/or BLACKWATER LODGE AND TRAINING CENTER, INC., and as such BLACKWATER is liable for their acts of fraud, malice and willful and wanton conduct.

## SECOND CAUSE OF ACTION

**[Rescission of Written Instrument for Fraud Against BLACKWATER Defendants]**

80.     Plaintiffs repeat and replead Paragraphs 1 through 79, inclusive, and incorporate the same herein by reference.

81.     On or about March 8, 2004, ESS, on the one hand, and REGENCY and BLACKWATER, on the other, entered into a written contract (the PRIMARY CONTRACT) for REGENCY and BLACKWATER to provide security services to ESS's catering operations in the Middle East.

82.     On or about March 12, 2004, REGENCY and BLACKWATER entered into an near identical written contract (the SUB-CONTRACT) solely to support the security services provided for under the PRIMARY CONTRACT.  The SUB-CONTRACT expressly incorporates by reference the terms and conditions of the PRIMARY CONTRACT.

83.     On or about March 25, 2004, Helvenston, Teague, Zovko and Batalona individually entered into separate Independent Contractor Service Agreements with BLACKWATER.  At all times during the negotiation of each of these Independent Contractor Service Agreements, BLACKWATER made certain representations regarding the PRIMARY CONTRACT and the SUB-CONTRACT, and expressly incorporated by reference the terms and

24

conditions of the PRIMARY CONTRACT and the SUB-CONTRACT into each and every Independent Contractor Service Agreement.

84.     BLACKWATER made representations of material facts to Helvenston, Teague, Zovko and Batalona that they would receive the protections, tools and information guaranteed by the PRIMARY CONTRACT and SUB-CONTRACT if they entered into the Independent Contractor Service Agreements, all the while intentionally concealing from them, and failing to disclose to them, the fact that BLACKWATER had no intention of and would not provide Helvenston, Teague, Zovko and Batalona these protections, tools and information once they entered into the Independent Contractor Service Agreements and began working for BLACKWATER in the Middle East.

85.     More specifically, to induce Helvenston, Teague, Zovko and Batalona to each enter into their respective Independent Contractor Service Agreements, the Directors of BLACKWATER, Brian Berrey and/or Mike Rush, assured them that they would be afforded the protections set forth in the PRIMARY CONTRACT and the SUB-CONTRACT, and made the following representations of material facts:

a.     That each of their security missions would be comprised of a team of no less than six (6) members;

b.     That each of their security missions would be performed in armored vehicles;

c.     That each of their security teams would be comprised of the two armored vehicles, with at least three security contractors in each vehicle, which would provide for a driver, a navigator, and a rear-gunner;

d.    That each of their security missions would have a rear-gunner with a heavy automatic weapon, such as a "SAW Mach 46," which could fire up to 850 rounds per minute, allowing the gunner to fight off any attacks from the rear;

e.    That they would be given at least 24-hours notice prior to any security mission;

f.    That each of their security missions would be subject to a Risk Assessment completed prior to the mission, and that if the threat level was too high, they would have the option of not performing the mission;

g.    That they would be afforded the opportunity to review the travel routes, gather intelligence about each mission, do a pre-trip inspection of the route and determine the proper logistics to carry out the security missions; and

h.    That they would arrive in the Middle East and have at least 21 days prior to any operations to become acclimated to the area, learn the lay of the land, gather intelligence, and learn safe routes through area.

These representations, as well as others, were made to induce Helvenston, Teague, Zovko and Batalona to each enter into their respective Independent Contractor Service Agreements.

86.    These representations of material facts by BLACKWATER concerning the protections which would be afforded to Helvenston, Teague, Zovko and Batalona, if they executed their individual Independent Contractor Service Agreements, were false. The true facts were as follows:

a.    BLACKWATER did not provide them with the minimum number of six (6) members on their security mission;

b.  BLACKWATER did not provide them with armored vehicles for their security mission;

c.  BLACKWATER did not permit them to have three (3) team members in each vehicle, which resulted in each vehicle containing only a driver and a navigator, but no rear-gunner to quell any attacks;

d.  BLACKWATER did not provide them with heavy automatic machine guns, but instead merely with semi-automatic rifles;

e.  BLACKWATER did not provide them with 24-hours notice of their security mission;

f.  BLACKWATER did not conduct a Risk Assessment prior to their security mission;

g.  BLACKWATER did not provide them with the opportunity to gather intelligence concerning the travel routes, do a pre-route inspection, and even refused to give them maps of the area; and

h.  BLACKWATER did not transport them to the Middle East 21 days prior to any operations to become acclimated to the area, learn the lay of the land, gather intelligence, and learn safe routes through Iraq, but instead they were sent over only a few days before they became operational.

87.  When the Defendants made these representations of material facts, the Defendants knew that they were false, or made them recklessly without any knowledge of their truth or falsity, as a positive assertion.  The Defendants knew these representations to be false at all times herein mentioned and concealed and suppressed the true facts, although the true facts were known to them.

27

88.    These false representations, suppressions and concealment by the Defendants were made with the intent to induce the Helvenston, Teague, Zovko and Batalona, and each of them, to rely on them, and with the intention that they would be acted upon by Helvenston, Teague, Zovko and Batalona, and each of them, in entering into their respective Independent Contractor Service Agreements with BLACKWATER.

89.    Helvenston, Teague, Zovko and Batalona, and each of them, in fact relied upon the misrepresentations of materials facts and non-existence of the facts suppressed and concealed by the Defendants, and acted upon them by entering into their respective Independent Contractor Service Agreements with BLACKWATER.  Had the true facts been known by Helvenston, Teague, Zovko and Batalona, each and every one of them would not have entered into their respective Independent Contractor Service Agreements.  This reliance by Helvenston, Teague, Zovko and Batalona was reasonable and justified, in that they were told about the protections, tools and information guaranteed by the PRIMARY CONTRACT and the SUB-CONTRACT, were told that the same would be afforded to them, and they were completely unaware that the Defendants were going to denying them those protections, tools and information once they entered into their respective Independent Contractor Service Agreements and traveled to the Middle East.

90.    In or about March 2004, BLACKWATER committed the aforementioned fraud, deceit, suppression and/or concealment of material facts known to them by failing to provide the protections, tools and information represented to these contractors in inducing them to enter into their respective Independent Contractor Service Agreements and accept employment with BLACKWATER for the ESS project.  This cause of action for rescission of the written

instruments for fraud relating to the Helvenston's, Teague's, Zovko's and Batalona's Independent Contractor Service Agreements arose prior to their deaths, and Helvenston, Teague, Zovko and Batalona would have been the plaintiffs of this cause of action had they lived.

91.    Helvenston, Teague, Zovko and Batalona suffered damages as a proximate cause of the Defendants' fraudulent conduct in inducing them to enter into their respective Independent Contractor Service Agreement, in that they traveled to Iraq and attempted to perform their services under the contracts, but because the Defendants denied them the promised protections, tools and information, Helvenston, Teague, Zovko and Batalona were all killed.

92.    Plaintiffs seek rescission of each and every Independent Contractor Service Agreement entered into with BLACKWATER by Helvenston, Teague, Zovko and Batalona, in that each and every contract was entered into as the result of BLACKWATER's fraud, deceit and misrepresentation.

93.    Alternatively, Plaintiffs seek recovery of damages suffered by Helvenston, Teague, Zovko and Batalona, and each of them, in an amount currently unascertained, but according to proof at trial, resulting from, *inter alia*, BLACKWATER fraudulently and deceptively luring them away from their families and loved ones for employment under the ESS project, their mental anguish, fear and terror of being forced to travel into the center of Fallujah without the promised protections, tools and information, and the physical pain and suffering of being shot, beaten, burned, tortured and dismembered.

94.    The aforementioned wrongful conduct of the Defendants constitutes fraud, malice, and/or willful and wanton conduct, depriving Helvenston, Teague, Zovko and Batalona of their lives, their property and/or their legal rights or otherwise causing damage, injury and death, in conscious disregard of their health and safety, so as to justify an award of punitive damages.

29

95.    At all relevant times alleged herein, JUSTIN MCQUOWN and THOMAS POWELL were managers of BLACKWATER SECURITY CONSULTING, LLC and/or BLACKWATER LODGE AND TRAINING CENTER, INC., and as such BLACKWATER is liable for their acts of fraud, malice and willful and wanton conduct.

96.    At all relevant times alleged herein, Brian Berrey and Mike Rush were officers and/or directors of BLACKWATER SECURITY CONSULTING, LLC and/or BLACKWATER LODGE AND TRAINING CENTER, INC., and as such BLACKWATER is liable for their acts of fraud, malice and willful and wanton conduct.

## PRAYER

WHEREFORE, Plaintiff prays that:

1.    Plaintiff RICHARD P. NORDAN, as ancillary administrator of the Estate of Stephen S. Helvenston, have and recover of the defendants, jointly and severally, compensatory damages in excess of $10,000 for the wrongful death of Steven S. Helvenston.

2.    Plaintiff RICHARD P. NORDAN, as ancillary administrator of the Estate of Mike R. Teague, have and recover of the defendants, jointly and severally, compensatory damages in excess of $10,000 for the wrongful death of Mike R. Teague.

3.    Plaintiff RICHARD P. NORDAN, as ancillary administrator of the Estate of Jerko Gerald Zovko, have and recover of the defendants, jointly and severally, compensatory damages in excess of $10,000 for the wrongful death of Jerko Gerald Zovko.

4.    Plaintiff RICHARD P. NORDAN, as ancillary administrator of the Estate of Wesley J.K. Batalona, have and recover of the defendants, jointly and severally, compensatory damages in excess of $10,000 for the wrongful death of Wesley J.K. Batalona.

5.      Each and every Independent Contractor Service Agreement entered into with BLACKWATER by Helvenston, Teague, Zovko and Batalona be rescinded.

6.      The estate of Stephen S. Helvenston recover from each of the Defendants punitive damages in the discretion of the jury.

7.      The estate of Mike R. Teague recover from each of the Defendants punitive damages in the discretion of the jury.

8.      The estate of Jerko Gerald Zovko recover from each of the Defendants punitive damages in the discretion of the jury.

9.      The estate of Wesley J.K. Batalona recover from each of the Defendants punitive damages in the discretion of the jury.

10.     Plaintiff be granted a trial by jury on all issues so triable.

11.     Plaintiff recover the attorneys' fees and costs of this action, and that those costs be taxed against the Defendants, including prejudgment interest as of the date of the filing of this complaint.

12.    For such other and further relief as the Court deems just and proper.

Dated: January 5, 2005                    **CALLAHAN & BLAINE, APLC**

                                          By: _____
                                              DANIEL J. CALLAHAN
                                              BRIAN J. McCORMACK
                                              MARC P. MILES
                                              3 Hutton Centre Drive, Suite 900
                                              Santa Ana, California 92707
                                              (714) 241-4444
                                              Attorneys for Plaintiff
                                              RICHARD P. NORDAN, as the Ancillary
                                              Administrator of the separate Estates of STEPHEN
                                              S. HELVENSTON, MIKE R. TEAGUE, JERKO
                                              GERALD ZOVKO and WESLEY J.K.
                                              BATALONA

Dated: January 5, 2005                    **KIRBY & HOLT, LLP**

                                          By: _____
                                              DAVID F. KIRBY
                                              WILLIAM B. BYSTRYNSKI
                                              3201 Glenwood Avenue, Suite 100
                                              Raleigh, North Carolina 27612
                                              (919) 881-2111
                                              Attorneys for Plaintiff
                                              RICHARD P. NORDAN, as the Ancillary
                                              Administrator of the separate Estates of STEPHEN
                                              S. HELVENSTON, MIKE R. TEAGUE, JERKO
                                              GERALD ZOVKO and WESLEY J.K.
                                              BATALONA

G:\2525\2525-02\Pleadings\Complaint.wpd

32

# STATE OF NORTH CAROLINA

File No.

**WAKE COUNTY**          FILED

In the General Court of Justice
☐ District  ☒ Superior Court Division

Name Of Plaintiff
RICHARD P. NORDAN, as Ancillary Administrator   2005 JAN -5  PH 4: 05  **GENERAL CIVIL ACTION**
for the separate Estates of

WAKE COUNTY C.S.C.

**COVER SHEET**

STEPHEN S. HELVENSTON,

BY

☒ **INITIAL FILING**      ☐ **SUBSEQUENT FILING**

MIKE R. TEAGUE,

Rule 5(b) Rules of Practice for Superior and District Courts

JERKO GERALD ZOVKO  and

Name And Address Of Attorney, Or Party If Not Represented (complete for initial appearance or change of address)

WESLEY J. K. BATALONA

**See attached.**

| **VERSUS** | |
|---|---|

Attorney Bar No.

| Name Of Defendants | Summons Submitted |
|---|---|
| BLACKWATER SECURITY CONSULTING, LLC | |
| BLACKWATER LODGE AND TRAINING CENTER, INC. | Summons Submitted |
| JUSTIN L. McQUOWN | Summons Submitted |
| THOMAS POWELL | Summons Submitted |
| | |
| | |

☒ Initial Appearance in Case      ☐ Change of Address

Name Of Firm

| Tax ID No. | Telephone No. | FAX No. |
|---|---|---|

Counsel for
☒ All Plaintiffs  ☐ All Defendants  ☐ Only (List party(ies) represented)

☒ Jury Demanded in Pleading
☐ Complex Litigation

☐ Amount in controversy does not exceed $15,000
☐ Stipulate to arbitration

| **TYPE OF PLEADING** | **CLAIM FOR RELIEF FOR** |
|---|---|

(check all that apply)

☐ Amended Answer/Reply (AMND-Response)
☐ Amended Complaint (AMND)
☐ Answer/Reply (ANSW-Response)
☒ Complaint (COMP)
☐ Confession of Judgment (CNFJ)
☐ Counterclaim vs. (CTCL)
  ☐ All Plaintiffs  ☐ Only (List on back)
☐ Crossclaim vs. (List on back) (CRSS)
☐ Extend Statute of Limitations, Rule 9 (ESOL)
☐ Extend Time for Answer (MEOT-Response)
☐ Extend Time For Complaint (EXCO)
☐ Rule 12 Motion In Lieu Of Answer (MDLA)
☐ Third Party Complaint (List Third Party Defendants On Back) (TPCL)
☐ Other (specify)

☐ Administrative Appeal (ADMA)
☐ Appointment of Receiver (APRC)
☐ Attachment/Garnishment (ATTC)
☐ Claim and Delivery (CLMD)
☐ Collection on Account (ACCT)
☐ Condemnation (CNDM)
☐ Contract (CNTR)
☐ Discovery Scheduling Order (DSCH)
☐ Injunction (INJU)
☐ Medical Malpractice (MDML)
☐ Minor Settlement (MSTL)
☐ Money Owed (MNYO)
☐ Negligence - Motor Vehicle (MVNG)
☐ Motor Vehicle Lien G.S. 44A (MVLN)
☐ Limited Driving Privilege - Out-of-State Convictions (PLDP)
☐ Possession of Personal Property (POPP)
☐ Product Liability (PROD)
☐ Real Property (RLPR)
☐ Specific Performance (SPPR)
☒ Other (specify) **Wrongful Death**

**NOTE:** Small claims are exempt from cover sheets.

| Date | Signature Of Attorney/Party |
|---|---|
| January 5, 2005 | |

**NOTE:** All papers filed in civil actions, special proceedings and estates shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts. The Clerk of Superior Court shall require a party to re-file any paper which does not include the required cover sheet.

AOC-CV-751
Rev. 11/96                    (Over)

**Name and Address of Attorneys for Plaintiff:**
(initial appearances)

David F. Kirby, State Bar #7841
William B. Bystrynski, State Bar #20883
Kirby & Holt. L.L.P.
P. O. Box 31665
Raleigh. NC  27622
(919) 881-2111     FAX:  (919) 781-8630

Daniel J. Callahan
Brian J. McCormack
Marc P. Miles
Callahan & Blaine, A.P.L.C.
3 Hutton Centre Drive, Suite 900
Santa Ana, CA  92707
(714) 241-4444     FAX:  (714) 241-4445

NORTH CAROLINA

WAKE COUNTY

RICHARD P. NORDAN, as Ancillary
Administrator for the separate Estates of
STEPHEN S. HELVENSTON, MIKE R.
TEAGUE, JERKO GERALD ZOVKO and
WESLEY J.K. BATALONA,

        Plaintiffs,

        v.

BLACKWATER SECURITY
CONSULTING, LLC, a Delaware Limited
Liability Company; BLACKWATER
LODGE AND TRAINING CENTER, INC.,
a Delaware Corporation; JUSTIN L.
MCQUOWN, an individual; and THOMAS
POWELL, an individual,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. _____



)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**PLAINTIFFS' MOTION FOR ADMISSION
PRO HAC VICE OF DANIEL J.
CALLAHAN, BRIAN J. McCORMACK
AND MARC P. MILES**

    Now come plaintiffs and move the Court pursuant to N.C. Gen. Stat. § 84-4.1 for

entry of an Order admitting Daniel J. Callahan, Brian J. McCormack and Marc P. Miles

*pro hac vice* on behalf of plaintiffs.

    In support of this motion, David F. Kirby and Kirby & Holt, L.L.P. respectfully

show the Court:

    1.    The affidavits of Daniel J. Callahan, Brian J. McCormack and Marc P.

Miles are attached hereto and set forth their qualifications to appear in this case pursuant

to N.C. Gen. Stat. § 84-4.1 and the North Carolina Rules of Civil Procedure.

    2.    The representation by Mr. Callahan, Mr. McCormack, Mr. Miles and

Callahan & Blaine, A.P.L.C., will be in conjunction with the undersigned.

3.      Mr. Callahan, Mr. McCormack, Mr. Miles and Callahan & Blaine are counsel of choice for Richard P. Nordan, Ancillary Administrator of the Estates of Stephen S. Helvenston, Mike R. Teague, Jerko Gerald Zovko and Wesley J.K. Batalona. The statement of Richard P. Nordan, Ancillary Administrator for the Estates of Stephen S. Helvenston, Mike R. Teague, Jerko Gerald Zovko and Wesley J.K. Batalona is attached.

WHEREFORE, for the reasons set forth herein, David F. Kirby and Kirby & Holt, L.L.P., respectfully request the Court to allow this Motion for Admission Pro Hoc Vice. A proposed Order is also submitted for the Court's review.

This the 3rd day of January, 2005.

KIRBY & HOLT, L.L.P.

David F. Kirby
William B. Bystrynski
Attorneys for Plaintiffs
P. O. Box 31665
Raleigh, NC 27622
(919) 881-2111

2

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. _____

RICHARD P. NORDAN, as Ancillary )
Administrator for the separate Estates of )
STEPHEN S. HELVENSTON, MIKE R. )
TEAGUE, JERKO GERALD ZOVKO )
and WESLEY J.K. BATALONA, )
)
Plaintiffs, )
)
v. )
)
BLACKWATER SECURITY )
CONSULTING, LLC, a Delaware )
Limited Liability Company; JUSTIN L. )
MCQUOWN, an individual; and )
THOMAS POWELL, an individual, )
)
Defendants. )
_____ )

**AFFIDAVIT OF DANIEL J.
CALLAHAN**

STATE OF CALIFORNIA

    Daniel J. Callahan, being first duly sworn upon oath states and alleges as follows:

    1.    I am a principal in the law firm of Callahan & Blaine, APLC, Santa Ana,

California. My address is 3 Hutton Centre Drive, Suite 900, Santa Ana, California 92707.

My telephone number is (714) 241-4444. I make and submit this Affidavit in support of

a motion for my admission *pro hac vice* in the above-captioned case.

    2.    Plaintiff Richard P. Nordan, as the ancillary administrator of the Estate of

Stephen S. Helvenston, Estate of Mike R. Teague, Estate of Jerko Gerald Zovko and

Estate of Wesley J.K. Batalona, has specifically requested that I represent the estates,

1

along with David F. Kirby of Kirby & Holt, L.L.P., in the above-captioned case.

3.     I am a member in good standing of the Bar of the State of California, to which I was admitted in 1980, State Bar No. 91490.

4.     I am also a member in good standing of the Bars of:

    a.     The United States Supreme Court to which I was admitted in 1997;

    b.     The State of Hawaii to which I was admitted in 1980;

    c.     The United States District Court for the Hawaii District to which I was admitted in 1980;

    d.     The United States Court of Appeals for the Ninth Circuit to which I was admitted in 1981;

    e.     The United States Tax Court to which I was admitted in 1981;

    f.     The United States District Court for the Northern District of California to which I was admitted in 1981;

    g.     The United States District Court for the Central District of California to which I was admitted in 1983;

    h.     The United States District Court for the Eastern District of California to which I was admitted in 1983;

    i.     The United States District Court for the Southern District of California to which I was admitted in 1983; and

    j.     The United States District Court for the Arizona District to which I was admitted in 1995.

5.     I am not under any restriction or probation in the practice of law in any jurisdiction in which I am licensed.

6.     I have never been disciplined for any misconduct by any court or lawyer regulatory organization, nor have I had admission as *pro hac vice* revoked.

2

7.     Unless permitted to withdraw sooner by order of the Court, I will continue to represent the plaintiff and the estates in the above-captioned proceeding until the final determination thereof, and with reference to all matters incident to the above-captioned proceeding, I agree to be subject to the orders and amenable to the disciplinary action and the civil jurisdiction of the General Court of Justice and the North Carolina State Bar in all respects as if I were a regularly admitted and licensed member of the Bar of North Carolina in good standing.

8.·     The State of California, one of the states in which I am regularly admitted to practice, grants like privileges to members of the Bar of North Carolina.

9.     I am personally appearing in the above-captioned proceeding with David F. Kirby of Kirby & Holt, L.L.P., 3201 Glenwood Avenue, Suite 100, Raleigh, NC 27612, who is a resident of the State of North Carolina, upon whom service may be had in all matters connected with the legal proceedings, or any disciplinary matter, with the same effect as if personally made on me within the State.

FURTHER AFFIANT SAITH NOT.

_____
Daniel J. Callahan

Sworn to and subscribed before me
This the ⸻ day of December, 2004.


_____
Notary Public

Blackwater.DJC1

3

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _____ } ss.

On _____, before me, _____
          Date                                      Name and Title of Officer (e.g. "Jane Doe, Notary Public")

personally appeared _____
                                              Name(s) of Signer(s)

☐ personally known to me
☐ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
                    Signature of Notary Public

**JEANNIE S. RINNER**
COMM. # 1446978
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
COMM. EXP. OCT. 24, 2007

Place Notary Seal Above

──────────── **OPTIONAL** ────────────

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

## Description of Attached Document

Title or Type of Document: _____

Document Date: _____    Number of Pages: _____

Signer(s) Other Than Named Above: _____

## Capacity(ies) Claimed by Signer

Signer's Name: _____

☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

**RIGHT THUMBPRINT OF SIGNER**
Top of thumb here

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. _____

RICHARD P. NORDAN, as Ancillary    )
Administrator for the separate Estates of )
STEPHEN S. HELVENSTON, MIKE R. )
TEAGUE, JERKO GERALD ZOVKO    )
and WESLEY J.K. BATALONA,    )
                                                        )
                    Plaintiffs,    )
                                                        )
          v.    )
                                                        )
BLACKWATER SECURITY    )
CONSULTING, LLC, a Delaware    )
Limited Liability Company; JUSTIN L. )
MCQUOWN, an individual; and    )
THOMAS POWELL, an individual,    )
                                                        )
                    Defendants.    )
_____ )

**AFFIDAVIT OF BRIAN J.
MCCORMACK**

STATE OF CALIFORNIA

    Brian J. McCormack, being first duly sworn upon oath states and alleges as

follows:

    1.    I am a principal in the law firm of Callahan & Blaine, APLC, Santa Ana,

California. My address is 3 Hutton Centre Drive, Suite 900, Santa Ana, California 92707.

My telephone number is (714) 241-4444. I make and submit this Affidavit in support of

a motion for my admission *pro hac vice* in the above-captioned case.

    2.    Plaintiff Richard P. Nordan, as the ancillary administrator of the Estate of

1

Stephen S. Helvenston, Estate of Mike R. Teague, Estate of Jerko Gerald Zovko and

Estate of Wesley J.K. Batalona, has specifically requested that I represent the estates,

along with David F. Kirby of Kirby & Holt, L.L.P., in the above-captioned case.

3.     I am a member in good standing of the Bar of the State of California, to

which I was admitted in 1993, State Bar No. 167547.

4.     I am also a member in good standing of the Bar of the United States District

Court for the Central District of California to which I was admitted in 1993.

5.     I am not under any restriction or probation in the practice of law in any

jurisdiction in which I am licensed.

6.     I have never been disciplined for any misconduct by any court or lawyer

regulatory organization, nor have I had admission as *pro hac vice* revoked.

7.     Unless permitted to withdraw sooner by order of the Court, I will continue

to represent the plaintiff and the estates in the above-captioned proceeding until the final

determination thereof, and with reference to all matters incident to the above-captioned

proceeding, I agree to be subject to the orders and amenable to the disciplinary action and

the civil jurisdiction of the General Court of Justice and the North Carolina State Bar in

all respects as if I were a regularly admitted and licensed member of the Bar of North

Carolina in good standing.

8.     The State of California, one of the states in which I am regularly admitted

to practice, grants like privileges to members of the Bar of North Carolina.

2

9.     I am personally appearing in the above-captioned proceeding with David F. Kirby of Kirby & Holt, L.L.P., 3201 Glenwood Avenue, Suite 100, Raleigh, NC 27612, who is a resident of the State of North Carolina, upon whom service may be had in all matters connected with the legal proceedings, or any disciplinary matter, with the same effect as if personally made on me within the State.

FURTHER AFFIANT SAITH NOT.

_____
Brian J. McCormack

Sworn to and subscribed before me
This the ___ day of December, 2004.

_____
Notary Public

Blackwater.BJM1

3

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _____ORANGE_____ } ss.

On _____ before me, _____,
　　　　　Date　　　　　　　　　　Name and Title of Officer (e.g. "Jane Doe, Notary Public")

personally appeared _____,
　　　　　　　　　　　　　　　　　Name(s) of Signer(s)

X personally known to me
☐ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
　　　　　　　　　Signature of Notary Public

JEANNIE S. RINNER
COMM. # 1446978
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
COMM. EXP. OCT. 24, 2007

Place Notary Seal Above

──────────────── *OPTIONAL* ────────────────

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

## Description of Attached Document

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

## Capacity(ies) Claimed by Signer

Signer's Name: _____

☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER

Top of thumb here

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. _____

RICHARD P. NORDAN, as Ancillary
Administrator for the separate Estates of
STEPHEN S. HELVENSTON, MIKE R.
TEAGUE, JERKO GERALD ZOVKO
and WESLEY J.K. BATALONA,

        Plaintiffs,

        v.

BLACKWATER SECURITY
CONSULTING, LLC, a Delaware
Limited Liability Company; JUSTIN L.
MCQUOWN, an individual; and
THOMAS POWELL, an individual,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF MARC P. MILES**

STATE OF CALIFORNIA

    Marc P. Miles, being first duly sworn upon oath states and alleges as follows:

    1.    I am an associate in the law firm of Callahan & Blaine, APLC, Santa Ana,

California. My address is 3 Hutton Centre Drive, Suite 900, Santa Ana, California 92707.

My telephone number is (714) 241-4444. I make and submit this Affidavit in support of

a motion for my admission *pro hac vice* in the above-captioned case.

    2.    Plaintiff Richard P. Nordan, as the ancillary administrator of the Estate of

Stephen S. Helvenston, Estate of Mike R. Teague, Estate of Jerko Gerald Zovko and

Estate of Wesley J.K. Batalona, has specifically requested that I represent the estates,

1

along with David F. Kirby of Kirby & Holt, L.L.P., in the above-captioned case.

3.     I am a member in good standing of the Bar of the State of California, to which I was admitted in 1998, State Bar No. 197741.

4.     I am also a member in good standing of the Bar of the United States District Court for the Central District of California to which I was admitted in 1998, and the United States Court of Appeals for the Ninth Circuit to which I was admitted in 2001.

5.     I am not under any restriction or probation in the practice of law in any jurisdiction in which I am licensed.

6.     I have never been disciplined for any misconduct by any court or lawyer regulatory organization, nor have I had admission as *pro hac vice* revoked.

7.     Unless permitted to withdraw sooner by order of the Court, I will continue to represent the plaintiff and the estates in the above-captioned proceeding until the final determination thereof, and with reference to all matters incident to the above-captioned proceeding, I agree to be subject to the orders and amenable to the disciplinary action and the civil jurisdiction of the General Court of Justice and the North Carolina State Bar in all respects as if I were a regularly admitted and licensed member of the Bar of North Carolina in good standing.

8.     The State of California, one of the states in which I am regularly admitted to practice, grants like privileges to members of the Bar of North Carolina.

9.     I am personally appearing in the above-captioned proceeding with David F. Kirby of Kirby & Holt, L.L.P., 3201 Glenwood Avenue, Suite 100, Raleigh, NC 27612,

who is a resident of the State of North Carolina, upon whom service may be had in all matters connected with the legal proceedings, or any disciplinary matter, with the same effect as if personally made on me within the State.

FURTHER AFFIANT SAITH NOT.

Marc P. Miles

Sworn to and subscribed before me
This the ____ day of December, 2004.

Notary Public

Blackwater.mpm1

3

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _____ } ss.

On _____ before me, _____
      Date                                    Name and Title of Officer (e.g. "Jane Doe, Notary Public")

personally appeared _____
                                         Name(s) of Signer(s)

X personally known to me
  proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

JEANNIE S. RINNER
COMM. # 1446978
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
COMM. EXP. OCT. 24, 2007

_____
Signature of Notary Public

Place Notary Seal Above

────────── **OPTIONAL** ──────────

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

## Description of Attached Document

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

## Capacity(ies) Claimed by Signer

Signer's Name: _____

    ☐ Individual

    ☐ Corporate Officer — Title(s): _____

    ☐ Partner — ☐ Limited ☐ General

    ☐ Attorney in Fact

    ☐ Trustee

    ☐ Guardian or Conservator

    ☐ Other: _____

**RIGHT THUMBPRINT OF SIGNER**
Top of thumb here

Signer Is Representing: _____

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. _____

RICHARD P. NORDAN, as Ancillary
Administrator for the separate Estates of
STEPHEN S. HELVENSTON, MIKE R.
TEAGUE, JERKO GERALD ZOVKO
and WESLEY J.K. BATALONA,

Plaintiffs,

v.

BLACKWATER SECURITY
CONSULTING, LLC, a Delaware
Limited Liability Company; JUSTIN L.
MCQUOWN, an individual; and
THOMAS POWELL, an individual,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**STATEMENT OF RICHARD P.
NORDAN IN SUPPORT OF
MOTION FOR ADMISSION <u>PRO
HAC VICE</u>**

Richard P. Nordan states and alleges as follows:

1.    I have been duly appointed the Ancillary Administrator of the Estate of

Stephen S. Helvenston by the Clerk of the Superior Court of Wake County, North

Carolina. I submit this statement in support of a motion for admission *pro hac vice* of

Daniel J. Callahan, Brian J. McCormack and Marc P. Miles in the above-captioned case.

2.    I have been duly appointed the Ancillary Administrator of the Estate of

Mike R. Teague by the Clerk of the Superior Court of Wake County, North Carolina. I

submit this statement in support of a motion for admission *pro hac vice* of Daniel J.

Callahan, Brian J. McCormack and Marc P. Miles in the above-captioned case.

3.    I have been duly appointed the Ancillary Administrator of the Estate of

Jerko Gerald Zovko by the Clerk of the Superior Court of Wake County, North Carolina. I submit this statement in support of a motion for admission *pro hac vice* of Daniel J. Callahan, Brian J. McCormack and Marc P. Miles in the above-captioned case.

    4.     I have been duly appointed the Ancillary Administrator of the Estate of Wesley J.K. Batalona by the Clerk of the Superior Court of Wake County, North Carolina. I submit this statement in support of a motion for admission *pro hac vice* of Daniel J. Callahan, Brian J. McCormack and Marc P. Miles in the above-captioned case.

    5.     My address is 3605 Glenwood Avenue, Suite 240, Raleigh, North Carolina 27612.

    6.     All four of the above-described estates have retained Daniel J. Callahan, Brian J. McCormack and Marc P. Miles, and the law firm of Callahan & Blaine, APLC, to represent the estates in the above-captioned case.

FURTHER PLAINTIFF SAITH NOT.

This the ⟨⟨ day of December, 2004.

_____
Richard P. Nordan

Sworn to and subscribed before me
This the 22 day of December, 2004.

_____
Notary Public

NANCY C. BURNS
"Notary Public"
Johnston County, NC
My Commission Expires 4-12-2007

Blackwater RPN1

2

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. _____

RICHARD P. NORDAN, as Ancillary )
Administrator for the separate Estates of )
STEPHEN S. HELVENSTON, MIKE R. )
TEAGUE, JERKO GERALD ZOVKO and )
WESLEY J.K. BATALONA, )
)
      Plaintiffs, )
)
    v. )
)
BLACKWATER SECURITY )
CONSULTING, LLC, a Delaware Limited )
Liability Company; BLACKWATER )
LODGE AND TRAINING CENTER, INC., )
a Delaware Corporation; JUSTIN L. )
MCQUOWN, an individual; and THOMAS )
POWELL, an individual, )
)
      Defendants. )

**ORDER GRANTING MOTION FOR
ADMISSION <u>PRO</u> <u>HAC</u> <u>VICE</u> OF DANIEL
J. CALLAHAN, BRIAN J. McCORMACK
AND MARC P. MILES**

FILED
2005 JAN -5 PH 1:05
WAKE COUNTY
BY _____

    The above-captioned matter came on for consideration by the Court on Plaintiffs' Motion

for Admission Pro Hac Vice of Daniel J. Callahan, Brian J. McCormack and Marc P. Miles.

    It appears to the Court that the Motion should be allowed.

    IT IS THEREFORE ORDERED that the motion be, and hereby is, GRANTED.

Accordingly, Daniel J. Callahan, Brian J. McCormack and Marc P. Miles are admitted *pro hac*

*vice*, for the sole purpose of representing plaintiffs in this action. They shall be subject to all

applicable rules of this Court.

    This the __5__ day of January, 2005.

                                _Donald W. Stephens_
                        Resident Superior Court Judge

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
05 CVS 000173

RICHARD P. NORDAN, as Ancillary )
Administrator for the separate Estates of )
STEPHEN S. HELVENSTON, MIKE R. )
TEAGUE, JERKO GERALD ZOVKO and )
WESLEY J.K. BATALONA, )
)
         Plaintiffs, )
)
    v. )
)
BLACKWATER SECURITY )
CONSULTING, LLC, a Delaware Limited )
Liability Company; BLACKWATER )
LODGE AND TRAINING CENTER, INC., )
a Delaware Corporation, JUSTIN L. )
MCQUOWN, an individual; and THOMAS )
POWELL, an individual, )
)
        Defendants. )
)

**MOTION FOR SHORTENING TIME
FOR NOTICE OF DEPOSITION**

NOW COMES plaintiff Richard P. Nordan, Ancillary Administrator of the Estates of

Stephen S. Helvenston, Mike R. Teague, Jerko Gerald Zovko and Wesley J. K. Batalona, and

moves the court for entry of an order pursuant to Rule 30(a) and Rule 30(b)(3) of the North

Carolina Rules of Civil Procedure regarding shortening the time for notice of the taking of a

deposition and shows the court further:

    1.      This action was filed January 5, 2005, in the Wake County Superior Court.

    2.      As outlined in the accompanying affidavit, a critical witness in this case, John

Potter, informed the plaintiffs that he is expecting to leave the country within the next three

weeks and will thereafter be unavailable for deposition.

3.      The plaintiff is informed and believes that Mr. Potter is about to go to Iraq, and will be unavailable for examination unless his deposition is taken before the expiration of the 30-day period following service of the complaint.  Plaintiffs plan to notice Mr. Potter's deposition for January 28, 2005.

4.      Plaintiffs seek permission of the court to shorten the requirement under Rule 30(b)(1) that Mr. Potter's deposition be taken only after all parties have 15 days notice prior to the taking of the deposition.

WHEREFORE, Plaintiffs respectfully request the Court issue an order shortening the time for notice of other parties of the deposition of Mr. Potter.

This the 11th day of January, 2005

**CALLAHAN & BLAINE, APLC**

Daniel J. Callahan
Brian J. McCormack
Marc P. Miles
Attorneys for Plaintiff
3 Hutton Centre Drive, Suite 900
Santa Ana, CA  92707
(714) 241-4444

**KIRBY & HOLT, L.L.P.**

David F. Kirby
William B. Bystrynski
Attorneys for Plaintiff
P. O. Box 31665
Raleigh, NC  27622
(919) 881-2111

prdk11970.012

2

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
05 CVS 000173

RICHARD P. NORDAN, as Ancillary )
Administrator for the separate Estates of )
STEPHEN S. HELVENSTON, MIKE R. )
TEAGUE, JERKO GERALD ZOVKO and )
WESLEY J.K. BATALONA, )
                                                    )
              Plaintiffs, )
                                                    )
      v. )
                                                    )
BLACKWATER SECURITY )
CONSULTING, LLC, a Delaware Limited )
Liability Company; BLACKWATER )
LODGE AND TRAINING CENTER, INC., )
a Delaware Corporation, JUSTIN L. )
MCQUOWN, an individual; and THOMAS )
POWELL, an individual, )
                                                    )
              Defendants. )
_____ )

**AFFIDAVIT OF DANIEL J. CALLAHAN**

STATE OF CALIFORNIA

Daniel J. Callahan, being first duly sworn upon oath states and alleges as follows:

1.      I am a principal in the law firm of Callahan & Blaine, APLC, Santa Ana, California. My address is 3 Hutton Centre Drive, Suite 900, Santa Ana, California 92707. My telephone number is (714) 241-4444. I make and submit this Affidavit in support of the Notice of Deposition of John Potter, which must be conducted prior to the expiration of the 30 day time period following the service of the summons and complaint in this matter, pursuant to Rule 30(b)(2) of the North Carolina Rules of Civil Procedure.

1

2.      On January 5, 2005, I was admitted *pro hac vice* by the Superior Court of North Carolina, Wake County, for the purpose of representing the plaintiff in the above-entitled case.

3.      On or about January 5, 2005, I contacted John Potter for the purpose of confirming his location of residence to eventually conduct his deposition. During that conversation, Mr. Potter refused to speak to me, and insisted that he will not be around to be deposed anyway, in that he is leaving the country for Iraq within the next three (3) weeks or so, and does not know when he will be returning to the United States.

4.      Mr. Potter is a material and critical witness in this case, and I believe that he has personal knowledge of relevant events. Considering Mr. Potter's indication that he will shortly leave the United States, and without any indication as to when or if he will be returning, it is necessary to conduct his deposition prior to the expiration of the 30-day time period after serving the summons and complaint, to be able to secure his testimony in this case.

FURTHER AFFIANT SAITH NOT.

DANIEL J. CALLAHAN

Sworn to and subscribed before me
This the  10  day of January, 2005

Notary Public

G:\2525\2525-02\Disc\DJC Potter Affidavit.wpd

2

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _ORANGE_ } ss.

On _1/10/05_, before me, _JEANNIE RINNER, NOTARY PUBLIC_
Date                              Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _DANIEL J CALLAHAN_,
                                        Name(s) of Signer(s)

☒ personally known to me
☐ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Jeannie S Rinner_
Signature of Notary Public

JEANNIE S. RINNER
COMM. # 1446978
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
COMM. EXP. OCT. 24, 2007

Place Notary Seal Above

———————— **OPTIONAL** ————————

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: _AFFIDAVIT OF DANIEL J CALLAHAN_

Document Date: _____   Number of Pages: _2_

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer**
Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited  ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

© 1999 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.nationalnotary.org    Prod. No. 5907    Reorder: Call Toll-Free 1-800-876-6827

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
05 CVS 000173

RICHARD P. NORDAN, as Ancillary )
Administrator for the separate Estates of )
STEPHEN S. HELVENSTON, MIKE R. )
TEAGUE, JERKO GERALD ZOVKO and )
WESLEY J.K. BATALONA, )
)
            Plaintiffs, )
)
    v. )
)
BLACKWATER SECURITY )
CONSULTING, LLC, a Delaware Limited )
Liability Company; BLACKWATER )
LODGE AND TRAINING CENTER, INC., )
a Delaware Corporation, JUSTIN L. )
MCQUOWN, an individual; and THOMAS )
POWELL, an individual, )
)
            Defendants. )
)

**DEPOSITION NOTICE**

YOU ARE HEREBY NOTIFIED THAT on January 28, 2005, beginning at 10:00 a.m., at

Northern Lights Real Time & Reporting, 3819 Hampton Drive, Anchorage, Alaska, 99504 [(907)

337-2221,] I will take the video taped deposition of John Potter, upon oral examination, pursuant

to Rules 26 and 30 of the North Carolina Rules of Civil Procedure. The deposition will be taken

before a Notary Public or some other officer duly authorized by law to take depositions.

Pursuant to Rule 30(b)(2) of the North Carolina Rules of Civil Procedure, this deposition

must be conducted prior to the expiration of the 30-day period after service of the summons and

complaint in this matter, as the deponent is about to leave the United States. The undersigned,

Daniel J. Callahan, contacted the deponent on or about January 5, 2005, for the purpose of

confirming his location of residence to eventually conduct his deposition. During that

conversation, the deponent refused to speak to the undersigned and insisted that he will not be

around to be deposed anyway, in that he is leaving the country for Iraq within the next three (3)

weeks or so, and does not know when he will be returning to the United States.

Dated: January 10, 2005                    **CALLAHAN & BLAINE, APLC**

By: _____

                       DANIEL J. CALLAHAN
                       BRIAN J. McCORMACK
                       MARC P. MILES
                       3 Hutton Centre Drive, Suite 900
                       Santa Ana, California 92707
                       (714) 241-4444
                       Attorneys for Plaintiff
                       RICHARD P. NORDAN, as the Ancillary
                       Administrator of the separate Estates of STEPHEN
                       S. HELVENSTON, MIKE R. TEAGUE, JERKO
                       GERALD ZOVKO and WESLEY J.K.
                       BATALONA

Dated: January 10, 2005                    **KIRBY & HOLT, LLP**

By: _____

                       DAVID F. KIRBY
                       WILLIAM B. BYSTRYNSKI
                       3201 Glenwood Avenue, Suite 100
                       Raleigh, North Carolina 27612
                       (919) 881-2111
                       Attorneys for Plaintiff
                       RICHARD P. NORDAN, as the Ancillary
                       Administrator of the separate Estates of STEPHEN
                       S. HELVENSTON, MIKE R. TEAGUE, JERKO
                       GERALD ZOVKO and WESLEY J.K.
                       BATALONA

G:\2525\2525-02\Disc\Potter Depo Ntc.wpd

2

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
05 CVS 000173

RICHARD P. NORDAN, as Ancillary )
Administrator for the separate Estates of )
STEPHEN S. HELVENSTON, MIKE R. )
TEAGUE, JERKO GERALD ZOVKO and )
WESLEY J.K. BATALONA, )
)
      Plaintiffs, )
)
      v. )
)
BLACKWATER SECURITY )
CONSULTING, LLC, a Delaware Limited )
Liability Company; BLACKWATER )
LODGE AND TRAINING CENTER, INC., )
a Delaware Corporation, JUSTIN L. )
MCQUOWN, an individual; and THOMAS )
POWELL, an individual, )
)
      Defendants. )
)

**ORDER SHORTENING TIME FOR
NOTICE OF DEPOSITION**

THIS MATTER coming on for hearing on plaintiffs' ex parte motion to shorten the

notice needed for deposition, and the Court, having reviewed the motion and the affidavit

submitted by the plaintiffs:

THE COURT hereby allows the plaintiffs' motion to shorten the time for notice of the

deposition of John Potter. Plaintiff is to serve notice of deposition on or before January 28,

2005.

This the _*11*_ day of January, 2005.

_Donald W. Stephens_
Superior Court Judge Presiding

PRDK119790.014

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
05 CVS 000173

RICHARD P. NORDAN, as Ancillary )
Administrator for the separate Estates of )
STEPHEN S. HELVENSTON, MIKE R. )
TEAGUE, JERKO GERALD ZOVKO and )
WESLEY J.K. BATALONA, )
)
        Plaintiffs, )
)
v. )
)
BLACKWATER SECURITY )
CONSULTING, LLC, a Delaware Limited )
Liability Company; BLACKWATER )
LODGE AND TRAINING CENTER, INC., )
a Delaware Corporation, JUSTIN L. )
MCQUOWN, an individual; and THOMAS )
POWELL, an individual, )
)
        Defendants. )
_____ )

**AFFIDAVIT OF SERVICE**

I, Nancy C. Burns, being duly sworn, depose and say:

1.      That I am over the age of eighteen and not a party to the above action.

2.      On the 11th day of January, 2005, at approximately 3:30 p.m., at C T Corporation System, 225 Hillsborough Street, Raleigh, North Carolina, I personally served the following documents on Defendant Blackwater Lodge and Training Center, Inc., in the above-captioned action:

   1.   Summons for defendant Blackwater Lodge and Training Center, Inc.

   2.   Complaint

   3.   Plaintiffs' Motion for Admission Pro Hac Vice of Daniel J. Callahan, Brian J. McCormack, and Marc P. Miles

1

4.  Order Granting Motion for Admission Admission <u>Pro</u> <u>Hac</u> <u>Vice</u> of Daniel J. Callahan, Brian J. McCormack, and Marc P. Miles

5.  Motion for Shortening Time for Notice of Deposition

6.  Order Shortening Time for Notice of Deposition

7.  Notice of Deposition of John Potter

8.  An original and one copy of Plaintiff's First Set of Requests for Admissions to Defendant Blackwater Lodge and Training Center, Inc.

9.  An original and one copy of Plaintiff's First Set of Interrogatories to Defendant Blackwater Lodge and Training Center, Inc.

10. An original and one copy of Plaintiff's First Set of Requests for Inspection and Production of Documents to Defendant Blackwater Lodge and Training Center, Inc.

11. A copy of Plaintiff's First Set of Requests for Admissions to Defendant Blackwater Security Consulting, LLC

12. A copy of Plaintiff's First Set of Interrogatories to Defendant Blackwater Security Consulting, LLC

13. A copy of Plaintiff's First Set of Requests for Inspection and Production of Documents to Defendant Blackwater Security Consulting, LLC

by delivery to and leaving copies of same with C T Corporation, an agent authorized by appointment or by law to be served, at said time and place (see white copy of said summons attached.)

This the 12th day of January, 2005.

*Nancy C. Burns*
Nancy C. Burns

SWORN TO AND SUBSCRIBED
before me this 12th day
of January, 2005.

*Deborah X. Lindum*
Notary Public
My Commission Expires: 9-4-2006

2

| STATE OF NORTH CAROLINA | File No. |
|---|---|

WAKE _____ County

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| RICHARD P. NORDAN, as Ancillary Administrator for the separate Estates of STEPHEN S. HELVENSTON, MIKE R. TEAGUE, JERKO GERALD ZOVKO and WESLEY J.K. BATALONA, Plaintiffs, **versus** BLACKWATER SECURITY CONSULTING, LLC, a Delaware Limited Liability Company; BLACKWATER LODGE AND TRAINING CENTER, INC., a Delaware Corporation, JUSTIN L. MCQUOWN, an individual; and THOMAS POWELL, an individual, Defendants. | Interrogatories, Request for Production of Documents, and Requests for Admissions to Defendants Blackwater Security & Blackwater Lodge; **CIVIL SUMMONS** Motion for Shortening Time, Order Shortening Time and Notice of Deposition G.S. 1A-1, Rules 3, |

☐ Alias and Pluries Summons

Date Last Summons Issued

## To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| BLACKWATER LODGE AND TRAINING CENTER, INC. By service on C T Corporation System 225 Hillsborough Street Raleigh, NC 27603 | |

## A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served.  You may serve your answer by delivering a copy to the plaintiff or by mailing to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff) | Date Issued | Time |
|---|---|---|
| David F. Kirby Kirby & Holt, L.L.P. P. O. Box 31665 Raleigh, NC 27622 | Signature | 4 0 4   ☐ AM ☐ PM ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court |

| ☐ ENDORSEMENT This Summons was originally issued on the date indicated above and returned not served.  At the request of the plaintiff, the time within which this Summons must be served is extended thirty (30) days. | Date Of Endorsement | Time |
|---|---|---|
| | Signature | ☐ AM ☐ PM ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial.  The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100
Rev. 9/96

(Over)

*Janet I. Pueschel*

# CIVIL RECEIPTING

as of  8/31/04

| | File Number (s): |
|---|---|
| (print validation on back of form) | Book and Page     or     Abstract (Judgment) Number: |
| | Payor Name: NORDAN, RICHARD P |
| | Payee Name: _____ |

EXECUTION  ☐        ☐  POSSESSION
    ☐    21430 $ _____

MISC FILING FEE:
    ☐    21435 $ _____

CONFESSION OF JUDGMENT:
    ☐    21400 $ _____

FILING FEES:
    ☑  CVSC    *Superior*      $ 85
    ☐  CVDC    *District*       $ _____
    ☐  CVMC   Small Claim   $ _____

ARBITRATION APPEAL     24310 $ _____

TRUST (*Minor's portion*)  26310 $ _____

JUDGMENT PAYMENT:           26115 $_____
    ☐  Full
    ☐  Partial

ATTORNEY FEES:                    24610 $_____

BOND FORFEITURE :            22800 $_____

TOTAL $_____

File No.

# LEAD DOCUMENT FOR
# MICROFILMING

### MICROFILM AUDIT TRAIL

| Date Filmed | Description | Film No. |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

AOC-G-113, Rev. 7/99
© 1999 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

_____ County

File No. ▶

In The General Court Of Justice
☐ Small Claims  ☐ District  ☐ Superior Court Division

Name Of Plaintiff

## VERSUS

Name Of Defendant

## CIVIL BILL OF COSTS

G.S. 7A-3

| | District Court | | Superior Court | Cumulative Total |
|---|---|---|---|---|
| | Magistrate | Judge | | |

**ADVANCE COSTS:**

General Court Of Justice Fee

District:  Magistrate.............................. $41.95

District:  Judge........................................ $52.95

Superior:  All Civil Cases............................$67.95

IDA Fee:  All Civil Cases.........................$ 1.05

Facilities Fee - Magistrate $12, District $16, Superior $16

To: _____

**TOTAL ADVANCE COSTS** ▶

**ADDITIONAL EXPENSES:**

Process Fee - $5 each process

To: _____

Other Sheriff's Fees - See G.S. 7A-311(a)(3)-(5)

To: _____

To: _____

Witness Fee - $5/day or fraction thereof, plus travel expenses

To: _____

Expert Witness Fee - As set by the Judge

To: _____

Certified Mail Or Service By Publication Cost

To: _____

Transcript - Costs on Appeal

To: _____

Other Fees - As set by the Judge (e.g., G.A.L. fee, interpreter's fee, premium on prosecution bond, costs of blood test to determine parentage, etc.)

To: _____

To: _____

To: _____

To: _____

Counsel Fee - As set by the Judge

To: _____

**TOTAL ADDITIONAL COSTS**.................................... ▶

**TOTAL COSTS AND ADDITIONAL CHARGES**.............. ▶

| Date | Prepared By |

To Be Paid By:  ☐ Plaintiff  ☐ Defendant  ☐ Per Judgment

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| RICHARD P. NORDAN, as Ancillary Administrator for the Separate Estates of STEPHEN S. HELVENSTON, MIKE R. TEAGUE, JERKO GERALD ZOVKO AND WESLEY J.K. BATALONA,<br><br>       Plaintiffs,<br><br>v.<br><br>BLACKWATER SECURITY CONSULTING, LLC, a Delaware Limited Liability Company; BLACKWATER LODGE AND TRAINING CENTER, INC., a Delaware Corporation, JUSTIN L. MCQUOWN, an individual; and THOMAS POWELL, an individual,<br><br>       Defendants. | |

## JOINDER IN AND CONSENT TO REMOVAL

Defendant JUSTIN L. MCQUOWN joins in and consents to the removal of this action from the Superior Court of North Carolina to United States District Court for the Eastern District of North Carolina Federal Court, pursuant to 28 U.S.C. §§ 1441 and 1446.

Justin L. McQuown

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

RICHARD P. NORDAN, as Ancillary
Administrator for the Separate Estates of
STEPHEN S. HELVENSTON, MIKE R.
TEAGUE, JERKO GERALD ZOVKO and
WESLEY J. K. BATALONA,

       Plaintiffs,

vs.

BLACKWATER SECURITY CONSULTING,
LLC, a Delaware Limited Liability Company;
BLACKWATER LODGE AND TRAINING
CENTER, INC., a Delaware Corporation;
JUSTIN L. McQUOWN, and individual; and
THOMAS POWELL, an individual,

       Defendants.

---

## JOINDER IN AND CONSENT TO REMOVAL

     Defendant, THOMAS POWELL, by and through his undersigned attorney, joins in and

consents to the removal of this action from the Superior Court of North Carolina to the United

States District Court for the Eastern District of North Carolina Federal Court, pursuant to 28

U.S.C. Sections 1441 and 1446. In consenting to this removal, Defendant Powell, who is

currently in Iraq and has not been served in this matter, does not otherwise waive his right to

contest personal jurisdiction or service. Defendant Thomas Powell authorizes the undersigned

attorney to enter this limited appearance for purposes of advising the Court and the parties that he

consents to and agrees this case should be removed to Federal Court as noted in Defendant

Blackwater's Notice of Removal filed herein.

Respectfully submitted,

Clifford C. Higby
Florida Bar No.: 793809
Bryant & Higby, Chartered
Post Office Box 860
Panama City, Florida   32402
(850) 763-1787
**Attorney for Defendant
Thomas Powell**

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Joinder In and Consent to Removal has been furnished to Mark A. Ash, 2500 First Union Capitol Center, Post Office Box 2611, Raleigh, North Carolina, 27602-2611; Margaret A. Ryan and Barbara Van Gelder, 1776 K Street, NW, Washington, District of Columbia, 20006-2304, by U.S. Mail and Fax Transmittal, this 24th day of January, 2005.

Clifford C. Higby